**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARTHA A. DOWLING** | : | **CASE NO: C2 05 0098** |
| | : | |
| **Plaintiff,** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **v.** | : | **MAGISTRATE JUDGE KING** |
| | : | |
| **LITTON LOAN SERVICING LP** | : | |
| | : | |
| **Defendant.** | : | **ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Martha Dowling moves for partial summary judgment in her favor pursuant to

Fed. R. Civ. Pro. 56. The evidentiary record presented in support of that motion includes the

pleadings, the authenticated documents attached thereto, and Litton Loan's responses to

plaintiff's interrogatories and requests for production, which are the subject of a separate motion

to permit physical filing under seal.

This record establishes that no genuine dispute exists as to the facts material to the issues

on which summary judgment is sought, and the supporting memorandum below shows that

plaintiff is entitled to judgment on these issues as a matter of law.

Respectfully submitted,
GRAHAM & GRAHAM CO., L.P.A.

/s/ Gary M. Smith
Gary M. Smith, (0017141)
Trial Counsel for Plaintiff
17 North 4th Street
P.O. Box 340
Zanesville, Ohio 43702-0340
Telephone: (740) 454-8585
Facsimile: (740) 454-0111
gmsmith@grahamlpa.com

**MEMORANDUM IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT**

I.      LITTON LOAN VIOLATED THE FAIR DEBT COLLECTION PRACTICES ACT
        IN ITS DEALINGS WITH MS. DOWLING

      A.      At all relevant times, Litton Loan was acting as a "debt collector" subject to the
        FDCPA according to 15 USC 1692a (6)

Paragraphs 5 and 7 of defendant Litton Loan's answer admits it acts as a "debt collector"

and is therefore subject to the federal Fair Debt Collection Practices Act, 15 USC 1692 et seq.,

when dealing with consumers allegedly in default at the time Litton first undertakes its collection

activities.

Paragraph 9 of Litton's answer admits plaintiff's allegation that it first took over

collection activities on Ms. Dowling's loan account, as previously performed by Fairbanks

Capital Corp., in March 2004. A three page "composite report" of some of the acts Litton

conducted thereon between March 30, 2004 and July 8, 2004 was provided by Litton in

discovery and is reproduced as Exhibit 1 to this motion.[1] Litton's first entry for Ms. Dowling's

account is dated March 31, 2004. It states "Prelim. Report: The Foreclosure Atttorney (sic) for

this file is John D. Clunk." In a letter of the same March 31, 2004 date, Litton represented to Ms.

Dowling that "[b]ecause this Debt was delinquent when the servicing of the loan was acquired

by Litton, Litton is a "debt collector" for purposes of the Federal Fair Debt Collection Practices

Act." [2]

_____

[1] Activities in the composite report are noted in reverse chronological order (earliest last).

[2] *See* March 31, 2004 Litton Loan letter to Paul Dowling and Martha Dowling, reproduced as
Exhibit 2 for ease of reference.

Consequently, as a matter of law, at all relevant times, Litton Loan was acting as a "debt collector" as defined in and subject to the FDCPA.

    B.      The evidence proves numerous and repeated violations of the FDCPA by Litton in its communications to Ms. Dowling

The FDCPA prohibits debt collectors from certain actions and makes wrongful certain conduct in any communication made to a consumer in connection with the collection of a consumer debt. The documentary evidence of record proves Litton's many repeated violations of these prohibitions.

    1.      Violations of 15 USC 1692c

Section (a)(2) of this statute outlaws all communication to a consumer "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address." Litton's responses to discovery request for documents maintained concerning Ms. Dowling or her account includes counsel's December 19, 2003 and January 27, 2004 letters to Fairbanks Capital Corp., the servicer from which Litton received the account. Those letters expressly warned that Ms. Dowling was represented by counsel and denied permission for any direct communications to Ms. Dowling.[3] Nonetheless, on the same day it took over the account, Litton sent Exhibit 2, the March 31, 2004 collection demand, directly to Ms. Dowling. The next day, Litton collection employees twice called her directly.[4] Employee "mejohnso" made another collection call directly to plaintiff on April 12, 2004; "emartine" called her a fourth time the next day, April 13, 2004; and "kljones" placed a fifth, "escalated" collection call directly to Ms. Dowling on April

---

[3] *See* letters reproduced in Exhibit 3 for ease of reference.

[4] *See* Exhibit 1, p. 3, entries for "04/01/2004 as to calls by "rwilson" and "dkennedy."

16, 2004.[5]  At the outset of this fifth call, "kljones" explicitly recorded Ms. Dowling's statement that she was represented by a lawyer, his name, and his telephone number. Jones nonetheless continued with the collection call until Ms. Dowling was "very upset," although Litton's record includes an April 16th note that "all calls to atty after today.'

On April 19, 2004, Litton signed the certified mail receipt accompanying a letter from Ms. Dowling's counsel dated April 15, 2004.[6] That letter explicitly warned Litton that Ms. Dowling was represented by counsel and expressly forbade all direct communication to Ms. Dowling.

Two days later, on April 22, 2004, Litton mailed a computer generated "Collections 47 day letter" demand directly to Ms. Dowling.[7] On May 4, 2004, less than ten days after assuring counsel in writing that it had taken necessary steps to assure Ms. Dowling was not dunned, Litton mailed to her home a formal "NOTICE OF DEFAULT AND INTENT TO ACCELERATE", representing that she faced foreclosure.[8]  Additional communications were sent to her wrongly under dates of May 24th and June 3, 2004.[9]

---

[5] Exhibit 1, p. 2.

[6] *See* Exhibit 4, reproduced and attached for ease of reference. Litton did not acknowledge this letter until April 26, 2004. *See* Exhibit 1, p. 2, entry for April 26, 2004, and exhibit 5 letter reproduced and attached for ease of reference.

[7] *See* Exhibit 1, p. 2 and exhibit 6, reproduced and attached for ease of reference.

[8] *See* Exhibit 1, p. 2, entry for May 4, 2004; exhibit 7, letter reproduced and attached for ease of reference.

[9] *See* corresponding entries on Exhibit 1, p. 1; exhibit 8, letter reproduced and attached for ease of reference.

2    Violations of 15 USC 1692e and 15 USC 1692g

Section 1692e of the Fair Debt Collection Practices Act provides:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . . .
>
> (2)  The false representation of—
>
>     (A)  the character, amount, or legal status of any debt;
>
> (5)  The threat to take any action that cannot legally be taken. . . . .

Litton's April 22, 2004 collection letter to Ms. Dowling falsely represented her account was "seriously delinquent" and that she owed $1,659.34 for failure to make monthly payments due "3/6/04" and "4/6/04."[10]  At the time that letter was sent, Litton knew the March 6, 2004 payment had been made to Fairbanks; Litton had not even assumed servicing responsibility for the account until March 22, 2004.[11]  Ms. Dowling's April 2004 payment was mailed on April 1, 2004, the day "rwilson" and "dkennedy" both called to harass her about the March payment.[12]  Consequently, Ms. March timely paid *both* the March and April 2004 installments long before Litton's April 22, 2004 dunning letter falsely represented she was "seriously delinquent" and falsely represented that she owed another $1,659.34.

---

[10] *See* Exhibit 6.

[11] Exhibit 1, p. 3, entry for April 1, 2004. *See also* copy of front and back of Ms. Dowling's check number 7384, payable to Fairbanks Capital Corp. and dated "3/1/2004," included in Litton Loan's discovery responses, reproduced for ease of reference as Exhibit 9, attached.

[12] *See* Exhibit 1, p.3.

Shortly thereafter, Litton maliciously escalated these false claims by serving Ms. Dowling with a fraudulent "formal notice" representing that her loan was in default and illegally threatening to accelerate the loan and commence foreclosure unless she immediately paid $1,659.34 which she did not owe.[13] Those false representations and illegal threats were repeated in a *second* "NOTICE OF DEFAULT AND INTENT TO ACCELERATE," sent to her under date of May 24, 2004.[14]

15 USC 1692g further prohibits the use of any unfair or unconscionable means to collect any debt, including "(1)  The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  In its dealings with Ms. Dowling, Litton was therefore prohibited from collecting or attempting to collect any amount the note and security agreement did not "expressly" authorize, or which was not permitted by law.[15] Once challenged, it is the debt collector's burden to prove a fee, interest charge, or other amount was contractually-authorized and permitted by the state's law.[16]

---

[13] *See* May 4, 2004 "NOTICE OF DEFAULT AND INTENT TO ACCELERATE," reproduced for ease of reference as Exhibit 7, attached.

[14] *See* May 24, 2004 "NOTICE OF DEFAULT AND INTENT TO ACCELERATE," reproduced for ease of reference as Exhibit 8, attached.

[15] *Duffy v. Landberg*, 215 F. 3d 871 (8th Cir. 2000)(interest charges not owed); *Pollice v. National Tax Funding*, 225 F. 3d 379 (3rd Cir. 2000)(unlawful late charges); *Newman v. CheckRite Cclifornia.* 912 F. Supp. 2d 1354 (E.D. Calif. 1995)(attorney fees); *Patzka v. Viterbo College*, 917 F. Supp. 654 (W.D. Wis. 1996)(alleged delinquency-related fees not expressly authorized by contract).

[16] *West v. Costen*, 558 F. Supp. 564 (W. D. Va. 1983); *Irwin v. Mascott*, 186 F.R.D. 567 (N.D. Cal. 1999).

Litton took over servicing of Ms. Dowling's account effective March 22, 2004.[17] On page two of that notice, underneath the box heading "NOTICE REGARDING REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) SECTION 6," Litton acknowledged that it could not demand certain charges without violating the law:

> "You should be aware of the following information, which is set out more fully in section 6 of the Real Estate Settlement Procedures Act (12 U.S.C. 2605):
>
> During the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by your new loan servicer as a late payment, and a late fee may not be imposed on you."

As Exhibit 1 documents, during "rwilson's" first April 1, 2004 collection call to Ms. Dowling, Litton was expressly told that Ms. Dowling had previously made the payment due March 6, 2004 to the old servicer, Fairbanks.[18]  Litton nonetheless persisted in treating that payment as delinquent.[19] Consequently, when Ms. Dowling sent her April 2004 payment to new servicer Litton, Litton refused to credit that on-time payment, attributing it instead to March 2004 and imposing a late charge on Ms. Dowling. Additional late charges were imposed through the same device as to Ms. Dowling's timely payments for May and June 2004, all in violation of  12 U.S.C. 2605.[20]

---

[17] *See* RESPA transfer notice dated March 18, 2004, complaint exhibit 1, attached here for ease of reference as Exhibit 10.

[18] *See* Exhibit 9, attached, (plaintiff's check number 7384, payable to Fairbanks Capital Corp., dated "3/1/2004").

[19] *See* Exhibit 1, p. 2, entry "Letter generated Collections 47 day letter" on April 22, 2004, exactly 47 days after March 6, 2004.

[20] *See* complaint exhibit 12, attached here for ease of reference as Exhibit 11(insistence that Ms. Dowling's payments one month in arrears and additions to the $314.80 late charges claimed due in its April 26, 2004 letter, Exhibit 5).

Second, Litton's entries on pages 1 and 2 of Exhibit 1, and the "Payoff Statement" of fees, charges, and interest demanded from Ms. Dowling when she refinanced to escape further dealings with Litton[21], document Litton's imposition of the following charges not expressly authorized or permitted by law.

     a.    "BK Atty Fees 900.00" (Exh.1, p. 2); "BK Atty Costs 150.00" (Exh.1, p. 1)

To the extent any attorney fees were advanced or incurred to assert or protect the interests of a servicer or noteholder in her Chapter 13 case, basic bankruptcy law prohibited Litton from collecting or attempting to collect those fees from Ms. Dowling unless the fees were an approved claim included in her Chapter 13 plan. If the fees were part of her approved plan, Ms. Dowling's obligation was indisputably satisfied by the full and complete discharge she received from the United States Bankruptcy Court for the Southern District of Ohio, Eastern Division, upon the trustee's report of her completion of the payments due under her approved Chapter 13 plan in August 2002.[22] Moreover, the contract, or Note, Litton was servicing did not provide any responsibility for attorney fees except for "reasonable attorney's fees, awarded by a court judgment."[23] Litton's discovery responses show no court award of any fees to justify the charges. Consequently, Litton's collection of $1,050.00 in bankruptcy attorney fees, and its

---

[21] *See* LITTON LOAN SERVICING LP June 17, 2004 Payoff Statement, in complaint exhibit 13, reproduced here for ease of reference in Exhibit 12.

[22] *See* counsel's January 27, 2004 correspondence and included bankruptcy court filings reproduced from Litton Loan's discovery and attached here for ease of reference as Exhibit 13.

[23] *See* Section E on first page of the March 31, 1998 Note payable to National Consumer Services Corp. LLC of Atlanta, Georgia, reproduced from Litton's discovery and attached for ease of reference as Exhibit 14.

failure to credit Ms. Dowling's account for the full amount of interest attributed to those fees during the post-discharge life of the loan at the 10.65% note rate, violated 1692g.

Ms. Dowling's discharge was granted in July 2002 and this loan was refinanced by paying the amount Litton demanded as owing effective July 1, 2004.[24] The post-discharge loan period therefore lasted two years. Consequently, the amount illegally collected as to these "BK atty fees" equaled $ 1,273.13.[25]

Litton illegally collected these amounts as part of the $68,222.81 paid from Ms. Dowling's 15 year, 5.83% refinancing loan, as Litton's condition to releasing the mortgage on Ms. Dowling's home.[26] For this violation of 1692g, Litton is therefore liable to Ms. Dowling for $2,386.48  ($1, 273.13 in wrongful fee and interest charges and the $1,113.35 in additional interest those wrongful charges will cost Ms. Dowling over the life of her current loan).

b.      "Prior Servicer Fees" (Exh.1, pp. 1 - 2)

Ms. Dowling originally sought counsel's help in dealing with Fairbanks because it claimed she had not completed her Chapter 13 plan and therefore had never been discharged from its disputed pre-bankruptcy claims for fees and advances.[27]  Litton had in its possession at

---

[24] *See* Exhibit 12.

[25] $1,050.00 plus $223.13 ($1,050.00 x .10625 x. 2).

[26] *See* June 24, 2006 HUD-1 settlement statement and Note payable to Harvest Federal Credit Union, attached as Exhibit 15.

[27] *See* Fairbanks Capital Corp.'s January 16, 2004 letter, Exhibit 16, attached.

all relevant times counsel's January 27, 2004 letter and accompanying bankruptcy filings proving the contrary.[28]

Again, basic bankruptcy law barred any claim that Ms. Dowling owed any "Prior Servicer Fees" not within her approved Chapter 13 plan. Again, if any such fees were part of that approved plan, Ms. Dowling's full obligation for them was satisfied and discharged on completion of her plan. Litton nonetheless included the following "Prior Servicer Fees" in the account balance it required Ms. Dowling to pay before it would release the mortgage on her home:

$3,076.34 MISC
   34.05 Prop Insp
  415.00 FC BPO
 1,106.00 Misc Corp Adv Disb

$ 4,361.34

The full amount of these fees, and all interest charges attributed to those fees at the 10.65% note rate during the post-discharge loan period, therefore constituted charges violating 1692g. Consequently, the amount illegally collected as to these "prior servicer charges" totaled $5,290.31.[29]

Litton apparently credited Ms. Dowling's account for other "prior servicer fees" totaling $6,362.66.[30] However, Litton failed to credit Ms. Dowling's account for the 10.65% note rate interest charged on those credited fees during the post-discharge term of the loan. The amount of that interest therefore also constituted a charge violating 1692g, equaling $1,347.58.

---

[28] *See* Exhibit 13, attached.

[29] $4,361.34, plus $928.97 ($4,361.34 x .1065 x 2).

[30] *See* Exhibit 1, pp. 1 -2 (5/10/2004 entries containing negative figures).

Litton illegally collected these amounts as part of the $68,222.81 paid from Ms. Dowling's 15 year, 5.83% refinancing loan, as Litton's condition to releasing the mortgage on Ms. Dowling's home.[31] For this violation of 1692g, Litton is therefore liable to Ms. Dowling for $ 11,095.14 ($5,290.31 in wrongful prior servicer fees and interest and/or interest charges and the $ 5,804.83 in additional interest those wrongful charges will cost Ms. Dowling over the life of her current loan).[32]

       c.     "Interest Due 2,075.81 (From 3/14/04 at 10.650%)" (Exhibit 12)

Litton did not take over servicing Ms. Dowling's account until March 22, 2004. Ms. Dowling had already timely made her March 2004 payment to the old servicer, Fairbanks.[33] Litton applied Ms. Dowling's April 2004 payment to March, her May 2004 payment to April, and her June 2004 payment to May.[34] Even under this wrongful and disputed application of Ms. Dowling's payments, for a refinancing on June 24, 2004, the most Litton could demand in accrued per diem interest would be for the six week period from the May payment due date (May 6, 2004) through the date of closing. However, as a condition to releasing the mortgage on Ms. Dowling's home, Litton demanded payment of interest charges for the entire period March 14,

---

[31] *See* June 24, 2006 HUD-1 settlement statement and Note payable to Harvest Federal Credit Union, attached as Exhibit 15.

[32] $6,637.89 x .0583 x 15 = $5,804.83.

[33] *See* Exhibit 1, p. 3 and Exhibit 9.

[34] *See* Exhibit 11, attached.

2004 – July 1, 2004, regardless that Ms. Dowling had already paid this interest once, being in fact and law current through June 6, 2004.[35]

That wrongful interest charge was collected as part of the $68,222.81 paid Litton from Ms. Dowling's 15 year, 5.83% refinancing loan.[36] For this violation of 1692g, Litton is therefore liable to Ms. Dowling for $ 1,614.06 in double charged interest[37] and the $1,411.50 in additional interest that overcharge will cost Ms. Dowling over the life of her current loan.

     d.     "Late Charges of 31.48" and "Defer Late Charges 346.28"  (Exhibit 12).

The evidence of record is that Ms. Dowling's account was paid currently for each month of the March – June 2004 period in which Litton collected it. Because Litton applied Ms. Dowling's April 2004 payment to the March payment she had already made to Fairbanks, and so on as to each month thereafter (despite explicit instructions sent with her June payment),  Litton wrongly imposed a $31.48 late charge for the June 2004 payment as a payoff condition to releasing the mortgage on her home at the refinancing.

Litton additionally demanded payment of $346.28 in "deferred" late charges. The evidence establishes those charges were unlawful and not expressly authorized by the Note for one or both of two reasons.

---

[35] *See* letter to Litton Loan accompanying Ms. Dowling's June 2004 payment, reproduced from Litton Loan's discovery and attached for ease of reference as Exhibit 17.

[36] *See* June 24, 2006 HUD-1 settlement statement and Note payable to Harvest Federal Credit Union, attached as Exhibit 15.

[37] Per diem of $19.24 times 24 days (June 6 – June 30, 2004) = $461.75, subtracted from $2,075.81 equals $1,611.06.

First, if these late charges were "deferred" from a time before Ms. Dowling's bankruptcy discharge, the law of course prohibited their collection.

On the other hand, if these charges were allegedly incurred in and deferred from the post-discharge period, the charges were not authorized by the Note. Litton's discovery responses prove Ms. Dowling was never delinquent prior to Litton's taking over servicing.

Litton stated in writing on June 2, 2004 that after review of the evidence presented with Ms. Dowling's prior qualified requests and a payment history from the prior servicer, it had concluded that Ms. Dowling's "delinquent cycle" began with a failure to timely pay her October 2002 mortgage installment:

> "It would appear that after the funds from the bankruptcy trustee were received and applied, beginning in May of 2002, the loan was not only brought current but it was being paid in advance.
> That status continued through 8/6/02 when funds were received and applied to the 9/6/02 payment. **That made the loan contractually next due for the 10/6/02 payment.** Fairbanks did not receive a payment in the months of September or October of 2002. When the next payment was received on 11/4/02, it was applied to the 10/06/02 payment that was then due and no other payments were received that month. This began the delinquent cycle that has since continued."  (emphasis added)[38]

However, the payment records for that period, produced with Litton's discovery, prove again Litton misstated Ms. Dowling's payment history, and no such delinquency ever occurred.[39]

The August 6, 2002 payment Litton's letter referenced was $631.66 and is labeled "Payment" for the October installment, as due "10/02," **not** the 09/02 payment as Litton falsely

---

[38] *See* June 2, 2004 correspondence from Litton Loan, reproduced from its discovery responses and attached here for ease of reference as Exhibit 18.

[39] *See* payment records for period 05-01-02 through 12-09-02, reproduced from Litton's discovery responses and attached here for ease of reference as Exhibit 19.

represented.[40] This reading is plainly correct, since an additional $301.83 was credited to Ms. Dowling's account by Fairbanks on August 12, 2002. Had her account been "contractually next due for the 10/06/02 payment" on August 12, 2002, Fairbanks would have posted that amount toward satisfaction of the "10/02" installment. Instead, it was indisputably attributed towards the installment identified as "**11/02**." While no payment was made in September or October 2002, Ms. Dowling made her regular full monthly payment of $631.66 on "11-04-02."

The payment record proves Litton was flat wrong in representing that Ms. Dowling was a month delinquent at all times through the end of Fairbanks' servicing because her October 2002 installment was never paid. Exhibit 19 from Litton's own records proves Ms. Dowling was in fact paid $301.83 *ahead* as of payment of her December 2002 installment. Consequently, imposing $346.28 in late charges because of a continuous delinquency beginning October 2002 was not as authorized by the Note.

The $377.76 total of these wrongful late charges was collected as part of the $68,222.81 paid Litton from Ms. Dowling's 15 year, 5.83% refinancing loan. For this violation of 1692g, Litton is therefore liable to Ms. Dowling for the $ 377.76 amount of those charges, and the $330.35 in additional interest that overcharge will cost Ms. Dowling over the life of her current loan.

---

[40] Exhibit 19 shows the September 2002 payment was actually posted as being paid effective "07-03-02."

3.       Litton's violation of 15 USC 1692h

Litton's discovery responses prove Litton and Ms. Dowling were involved in a disputed about loan charges and the making of her monthly loan payments when she delivered her June 2004 monthly installment payment to Litton with written instructions that that payment be applied to the principal and interest due on her loan for the month of June 2004.[41] Those responses also prove Litton did not apply that payment according to her directions, but instead applied it pursuant to its disputed contention that Ms. Dowling's account was delinquent because of unpaid charges and installments.[42] Litton thereby violated 15 USC 1692h, which prohibits a debt collector from applying a consumer's payment: "to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions."[43]

C.       Plaintiff is entitled to recover all her pecuniary losses, damages for anxiety, emotional suffering, embarrassment, and inconvenience, statutory damages, and an award of attorney fees due to these violations of the FDCPA

Congress established the statutory cause of action for violations of the FDCPA in 15 U.S.C. 1692k. Subsections A and B allow recovery of statutory damages and attorney fees.  In addition,

---

[41] *See* Exhibit 17.

[42] *See* Exhibit 1, p. 1, entry for "06/25/2004" and Litton correspondence of June 30, 2004, reproduced from Litton's discovery responses and attached as Exhibit 17 for ease of reference.

[43] *See also Reliance Universal, Inc. v. Deluth Const. Co.* (1981), 67 Ohio St.2d 56, 64; *City of East Cleveland Dept. of Taxation v. Davis* (8th Dist. 1994), 1994 WL 189542, *2  (attached) (when debtor tenders a sum sufficient to satisfy a particular debt and directs application of the payment accordingly, creditor must apply payment in accord with the debtor's instruction if payment is accepted).

1692k(A)(1) provides that "any debt collector who fails to comply with any provision of this title with respect to any person is liable to such person in an amount equal to the sum of-- any actual damage sustained by such person as a result of such failure." The "actual damages" recoverable under 1692k(A)(1) include compensatory damages for emotional distress, humiliation, worry, embarrassment, and inconvenience[44]; out-of-pocket and other consequential losses (such as extra interest charges and recovery of sums collected over and above what was legally owed).[45]

Ms. Dowling will reserve the question of compensatory damages for emotional distress, humiliation, worry, embarrassment, and inconvenience, and her attorney fee claim, for the Court's determination on the evidence produced at trial. However, pursuant to the foregoing, as a matter of law, plaintiff is entitled partial summary judgment as to Litton's liability for these various FDCPA violations, and for a recovery of $ 18,215.29, comprised of $1,000.00 in statutory damages and $17,215.29 for the out-of pocket injuries detailed above.

---

[44] *See, e.g., Boyce v. Attorney's Dispatch Service*. 1999 WL 33495605 (S.D.Ohio 1999) (plaintiffs entitled to recover for emotional distress, humiliation and embarrassment resulting from violations)(attached).

[45] *See Keele v. Wexler*, 149 F. 3d 589 (7th Cir. 1998)(collector customarily violated FDCPA by illegally obtaining payment from class members of $12.50 more than it was lawfully owed under state law; actual damages therefore included the $12.50 to which collector had no legal entitlement); *Ballard v. Equifax Check Services*, 158 F. Supp. 2d 1163 (E.D. Cal. 2001)(same as to amounts in excess of debt lawfully owed collector); *Hansen v. Ticket Track, Inc.*, 213 F.R.D. 412 (W.D. Wash. 2003)(actual damages equals amount collector received in excess of debt legally owed collector); *Gervais v. O'Connell, Harris & Associates,* 297 F. Supp. 2d 435 (D. Conn. 2003)(actual damages equal amounts illegally collected); *Miele v. Sid Bailey, Inc.*, 192 B.R. 611 (S.D.N.Y. 1996)($703.43 seized by the debt collector constituted actual damages recoverable by consumer who legally owed it no debt).

II.   LITTON LOAN VIOLATED DUTIES OWED MS. DOWLING
      UNDER 12 USC 2605 AND REG. X


The Real Estate Settlement Procedures Act, 12 USC 2605 and the implementing

regulations appearing at 24 CFR 3500.21, establish duties the servicer of a loan owes the

borrower upon receipt of a "qualified written request."[46] Those duties include:

> Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays)
> after the receipt from any borrower of any qualified written request . . .  and, if
> applicable, before taking any action with respect to the inquiry of the borrower,
> the servicer shall-
>
> > (A) make appropriate corrections in the account of the borrower, including
> > the crediting of any late charges or penalties, and transmit to the borrower
> > a written notification of such correction (which shall include the name and
> > telephone number of a representative of the servicer who can provide
> > assistance to the borrower). . . [47]

Pursuant to 12 USC 2605(f), any servicer who fails to comply with any obligation imposed by

section 2605:

> "shall be liable to the borrower for *each* such failure in the following amounts:
>
>    (1)  INDIVIDUALS.—In the case of any action by an individual, an amount
> equal to the sum of--
>      (A)  any actual damages to the borrower as a result of the failure; and
>      (B)  any additional damages, as the court may allow, in the case of a pattern
> or practice of noncompliance with the requirements of this section, in an amount
> not to exceed $1,000. . . .
>
>     (3)  COSTS.—In addition . . .  in the case of any successful action under this

---

[46] Defined in 24 CFR 3500.21(e)(2) as "a written correspondence (other than notice on a
payment coupon or other payment medium supplied by the servicer) that includes, or otherwise
enables the servicer to identify, the name and account of the borrower, and includes a statement
of the reasons that the borrower believes the account is in error, if applicable, or that provides
sufficient detail to the servicer regarding information relating to the servicing of the loan sought
by the borrower."

[47] 12 USC 2605(e)(2).

section, the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances." [48]

As under the FDCPA, actual damages include pecuniary losses and compensatory damages for emotional distress, anxiety, inconvenience, frustration, etc.[49] The evidentiary record proves Litton received Ms. Dowling's qualified written requests dated January 27, 2004 and April 15, 2004. As shown about, these qualified written requests, the bankruptcy documents and check copies included with them, the March 31, 1998 Note, and Fairbanks' payment records, provided Litton all the information it needed to determine that Ms. Dowling's account was not delinquent, but current through June 6, 2004; and that all attorney fees, prior servicer fees, late payment charges, and any interest charges attributable to those fees were improperly debited to her account.

Nonetheless, Litton Loan utterly failed to correct these errors within 60 days, in violation of the duties owed Ms. Dowling under section 2605.[50] Ms. Dowling will reserve the question of compensatory damages for emotional distress, humiliation, worry, embarrassment, and inconvenience, and her attorney fee claim, for the Court's determination on the evidence produced at trial.[51] But at this point, as a matter of law plaintiff is entitled to partial summary judgment as to Litton's liability for violating its duties under section 2605, and for a recovery of

---

[48] Emphasis added.

[49] *See* *Hutchinson v. Delaware Sav. Bank FSB*, 410 F.Supp.2d 374 (D. N.J. 2006); *Johnstone v. Bank of America, N.A.*, 173 F.Supp.2d 809 (N.D. Ill. 2001); *Rawlings v. Dovenmuehle Mortg., Inc.*, 64 F.Supp.2d 1156 (M.D.Ala.1999).

[50] *See* Exhibit 12, Litton's June 17, 2004 payoff demand including all these charges.

[51] *Cf.*, *Wright v. Litton Loan*, 2006 WL 891030 (E.D.Pa. 2006)(award of $25,000.00 in emotional distress damages for violating REPA section 2605) (attached).

$18,215.29, comprised of $1,000.00 in statutory damages and $17,215.29 for the out-of pocket

injuries resulting from Litton's failure to timely correct her account.

III.    LITTON LOAN VIOLATED THE FEE AND CHARGES PROHIBITIONS TO WHICH
        IT AGREED WHEN IT SOUGHT AND OBTAINED LICENSURE UNDER THE
        OHIO MORTGAGE LOAN ACT, R.C. 1321.51 et seq.

        The Ohio Mortgage Loan Act (OMLA), codified in relevant part at R.C. 1321.51 –

1321.57, was enacted as a usury statute. R.C. 1321.52 (A)(1) defines those to whom the Ohio

Mortgage Loan Act applies:

> "No person, on that person's own behalf or on behalf of any other person, shall
> do either of the following without having first obtained a certificate of
> registration from the division of financial institutions:
>
> (a) Advertise, solicit, or hold out that the person is engaged in the business of
> making loans secured by a mortgage on a borrower's real estate which is other
> than a first lien on the real estate;
>
> (b) Engage in the business of lending or collecting the person's own or another
> person's money, credit, or choses in action for such loans."

Litton's answer admits it is regularly engaged in the business of collecting another person's

money, credit, or choses in action in connection with residential mortgage loans.[52] That is likely

---

[52] *See* answer ¶ 6, admitting paragraph 5 of the complaint.

why Litton sought and obtained licensure from the Ohio Department of Commerce to conduct

that business in Ohio as an OMLA "registrant."[53]

      To prevent usury, the OMLA limits the types and amounts of fees or charges a

"registrant" may impose or receive in any form, and the amounts on which a registrant may

lawfully charge or collect any interest. Under R.C. 1321.57(H)(1), no registrant may impose or

receive any charge or fee or interest of any type or amount "whatsoever" except as explicitly

authorized within the text of R.C. 1321.57.[54] The authoritative treatise on Ohio's consumer and

lending laws explains the meaning and effect of R.C. 1321.57 (H)(1) in this way:

> "At the heart of . . . [the Mortgage Loan Act], from [its] earliest incarnations to the
> present, is the unequivocal prohibition against the charging of any amount, whether
> interest, principal, or otherwise, except as expressly authorized. In this manner, these
> statutes depart from standard usury laws which merely specify the rates of interest
> that may not be exceeded and leave it to the lenders to determine how to stay within
> those limits. Thus, if a charge is identified in . . . an MLA loan for which statutory
> authority cannot be found, it is illegal and usurious and entitles the borrower to . . .
> MLA remedies.
>
> . . .[ R.C.1321.57 (H)(1) requires] adherence to maxim [sic] *expressio unius
> est exclusion alterius* in any analysis. . . which means that if any fee, charge, or other
> amount has not been expressly approved by the General Assembly for . . . a
> registrant under the Mortgage Loan Act, it is absolutely prohibited.

---

[53] *See* print out of electronic public records from the official governmental website maintained
for public access and reference by the Ohio Department of Commerce at the URL address stated
on those records, attached here as Exhibit 20. The content of Exhibit 20 is admissible under the
hearsay exception for public records, and the authenticity of that content is capable of accurate
and ready determination by resort to the same electronic document sources from which these
exhibits were printed, the reliability of which is not subject to reasonable dispute. Plaintiff is
therefore entitled to have this Court take judicial notice of these records and their content
pursuant to F.R.E. 201(B).

[54] "In addition to the interest and charges provided for by this section, no further or
other amount, whether in the form of broker fees, placement fees, or any other fees
whatsoever, shall be charged or received by the registrant. . . ." The only types and amounts of
fees and charges lawful under the OMLA are those expressed set forth in R.C. 1321.57 (G) –
(H).

> . . . [These] closely regulated lenders are limited in every nuance of their
> lending if not in virtually every aspect of their licensed business enterprises. As a
> result, any amount "charged", whether principal, interest, or fee, which is not
> explicitly approved by . . .the MLA is usurious."[55]

When a registrant contracts for or collects even a single charge, fee, interest, or amount other than or in addition to those explicitly authorized by the OMLA, R.C. 1321.56 imposes a stern forfeiture against that registrant:

> Any person who willfully violates section 1321.57 of the Revised Code shall forfeit to
> the borrower the amount of interest paid by the borrower.

In the context of usury and consumer protection statutes, Ohio law uses the term "wilfully" to mean voluntarily and intentionally, but not necessarily with malice (i.e., actual intent to violate the law is not required).[56]

The undisputable evidence of record proves Litton violated R.C. 1321.57(A)(1) by voluntarily and intentionally collecting the following fees and charges not expressly authorized by R.C. 1321.57:

    a.    bankruptcy-related attorney fees of $1,060.00 (Exhibit 1, pp. 1 - 2);

    b.    "miscellaneous," property inspection, "FP BO," and "corporate advance fees" totaling $ 4,361.34 (Exhibit 1, pp. 1 - 2);

    c.    excess "double" interest for the period March 14 – July 1, 2004, in the amount of $1,614.06 (Exhibit 12);

    d.    Late charges of $377.76 for payments that were not delinquent (Exhibit 12);

---

[55] *Ohio Consumer Law* (2004 Ed., Thomson-West Pub. Co.), Chapter 14, section 14:39, p. 448.

[56] *See Glouster Community Bank v. Winchell* (4th Dist. 1995), 103 Ohio App. 3d 256 (usurious charge included in pre-printed form was "wilfully" contracted for, under similar "expressio unius" usury scheme of the Ohio Retail Installment Sales Act, R.C. 1317.01 et seq.). *Similarly, see State ex rel Celebreeze v. Ferraro* (2nd Dist. 1989), 63 Ohio App. 3d 168 (under Ohio's Consumer Sales Practices Act, fact that unconscionable language was in business' pre-printed form contracts was sufficient to establish business intended to impose that contract term, thus business acted "knowingly").

     e.        "Prev. Server Exp." of $536.35 (Exhibit 12);

     f.        A "PRIORITY PROCESSING" charge of $15.00 (Exhibit 12);

     g.        An "INSPECTION FEE" of $9.00 (Exhibit 12); and

     h.        A Quote Fee of $10.00 (Exhibit 12).

These illegal and excessive fees were collected as part of the $68,221.81 Litton demanded and was paid before it would release the mortgage on Ms. Dowling's home.

Pursuant to R.C. 1327.56, Litton must therefore forfeit to Ms. Dowling the amount of the interest she paid on the March 31, 1998 mortgage loan. The amount of that forfeiture can be simply calculated based on the facts already before this Court.

The original principal amount of Ms. Dowling's loan was $68,000.00 and the amount of the monthly payments was $629.66.[57] Ms. March filed Chapter 13 bankruptcy in 2000, but because the loan was secured by her home, the approved Chapter 13 plan, at a minimum, required her to become current on the missed installments through payments over the life of her plan while keeping up with the current payments at the same time.

According to Litton's stated position, after completion of her Chapter 13 payments, Ms. Dowling *was* current in her monthly payments through September 2002.[58] Litton's June 2, 2004 letter also conceded that Ms. Dowling's monthly payments were regular after November 2002 right through the end of Fairbank's servicing. Therefore, by June 2004, it is plain that Litton's position was limited to a claim that Ms. Dowling had only failed to make a payment in October 2002 and March 2004. However, the record in this Court proves Ms. Dowling *did* make both the

---

[57] *See* Exhibit 14, March 31, 1998 Note.

[58] *See* Litton's letter of June 2, 2004, attached as Exhibit 18.

October 2002 and March 2004 payments, as she insisted to Litton at the time.[59] Consequently, the evidence before this Court is that Ms. Dowling made a monthly installment payment of at least $629.66 attributable to each month between April 1998 and June 2004, inclusive.[60]

The sum of those 39 payments equals $24,556.74. Subtracting that total from the $68,000.00 principal amount reveals that if all those payments had been applied to the principal, only $43,443.26 of that principal balance would have remained unpaid by the time of the June 24, 2004 refinancing. In actuality, according to Exhibit 12, as of June 24, 2004 Ms. Dowling still owed $65,045.55 in "unpaid principal." Consequently, Ms. Dowling's 39 monthly installments had paid $21,602.29 in interest.[61]  By adding the $2,075.81 collected at closing for "Interest Due from 3/14/04 at 10.65%," it is thus apparent that plaintiff is entitled to partial summary judgment against Litton Loan for violating R.C. 1321.57 in the amount of $23,781.10.


IV.     LITTON LOAN HAS COMMITTED UNFAIUR, DECEPTIVE, AND
        UNCONSCIONABLE ACVTS IN VIOLATION OF THE OHIO CONSUMER SALES
        PRACTICES ACT


Litton Loan's answer admits Litton is regularly engaged in the business of collecting and processing payments made on residential mortgage loans under contractual agreements maintained with real estate investment trusts.[62] Exhibit 2, the March 31, 2004 validation notice

---

[59] *See* Exhibit 19 (payment history for October 2002) and Exhibit 9 (March 1, 2004 Check #7384 payable to Fairbanks Capital Corp.)

[60] These 39 months constituted the term during which the loan signified by Exhibit 14 was outstanding.

[61] $65,045.66 – 43,443.28 = $21,602.29.

[62] *See* answer ¶6, admitting complaint paragraph 5. *See also* Exhibit 2 (March 31, 2004 validation notice from Litton Loan identifying the creditor it is collecting for as "BLOCK MTG ASSET BK CERT," a real estate investment trust.

Litton Loan sent Ms. Dowling after taking over collection from Fairbanks, identifies the creditor it is collecting for as "BLOCK MTG ASSET BK CERT," a real estate investment trust.

The answer affirmatively denies that Litton originates or holds loans.[63] Plaintiff's request for production of documents #6 specifically asked Litton to:

> "[p]lease produce all documents and communications which evidence every estate, leasehold, or other legal or equitable title or interest in plaintiff's home which Litton Loan held, owned, or acquired in its own name at any time after January 1, 2004."

Litton's sworn response was: "None. Defendant was the servicer of the mortgage loan and was not the beneficial owner of the mortgage loan."

The Note shows the March 31, 1998 loan was originated by a Georgia non-banking lender, National Consumer Services Corp., L.L.C. Litton admits it also does not keep an office or other place of business within the State of Ohio.[64]

Since Litton satisfies none of the definitional requirements necessary to constitute a "financial institution" subject to Ohio's intangibles tax, as defined in R.C. 5725.01, the dealings between Litton and Ms. Dowling were not exempt from the prohibitions and requirements of the Ohio Consumer Sales Practices Act (CSPA), R.C. 1345.01 et seq.

Those subject to the CSPA are strictly liable for all deceptive or unfair acts; consumers need not prove detrimental reliance or intentional disregard of the law.[65] Whether the supplier

---

[63] Answer ¶2.

[64] *See* answer ¶ 3 admitting the allegation of complaint paragraph 2.

[65] *See Motzer Dodge Jeep Eagle, Inc. v. Ohio Attorney General* (12th Dist. 1994), 95 Ohio App.3d 183, 186 – 187 (even technical violation entitles consumer to recovery despite oral disclosures by supplier); *Renner v. Derin Acquisition Corp.* (8th Dist. 1996), 111 Ohio App.3d 326, 335.

acted in good faith is also immaterial to strict liability.[66] Since intent and reliance are not proof elements necessary for liability, consumers are entitled to relief under R.C. 1345.09 as soon as the facts show that a prohibited act or practice was committed.[67]

Moreover, the only defenses to CSPA liability the General Assembly allowed are those expressly listed in R.C. 1345.11(A) (bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error) and R.C. 1345.11 (B) (act was required or specifically permitted by the Federal Trade Commission Act). No other defenses were statutorily provided for; therefore no others are cognizable at law or can be allowed.[68] By statute, the right to recover treble an individual plaintiff's actual damages is supplemental and in addition to relief available under other laws or theories of action.[69]

The evidence of record proves that Litton knowingly committed several unfair, deceptive, and/or violations of the CSPA. It is a deceptive and unconscionable act for a supplier engaged in the collection of a debt to use any statement of notice which falsely represents the status or other

---

[66] *See D&K Roofing v. Pleso* (11th Dist. 1991), 77 Ohio App. 3d 181, 184; *Martinez v. Decorators Warehouse, Inc.* (8th Dist. 1983), 1983 WL 2896, *4 (attached).

[67] *Frey v. Vin Devers, Inc.* (6th Dist. 1992), 80 Ohio App.3d 1; *Smaldino v. Larsick* (11th Dist. 1993), 90 Ohio App. 3d 691, 697.

[68] *See, e.g., Andrews v. Scott Pontiac Cadillac GMC* (6th Dist. 1991), 71 Ohio App.3d 613, 621 (substantial compliance no defense to rule violation); *Renner v. Derin Acquisition Corp.* (8th Dist. 1996), 111 Ohio App.3d 326, 335 (consumer's actual knowledge of truth is no supplier defense); *Myers v. Curt Bullock Builders, Inc.* (9th Dist. 1991), 1991 WL 172418 (contract defenses of accord or satisfaction not applicable to CSPA claims); *Doody v. Worthington* (Franklin Co. Muni. 1991), 1991 WL 757571, *3 (waiver, ratification and other common law defenses inapplicable to CSPA claims)(both attached).

[69] R.C. 1345.13; *Crye v. Gerald Smolak dba Jerry's Automatic Transmissions* (10th Dist. 1996), 110 Ohio App.3d 504; *Roebuck v. Doug Bigelow Chev.* (9th Dist. 1988), 1988 WL 21284 (attached).

facts about the debt.[70] It is an unconscionable act or practice in violation of R.C. § 1345.03(A) for a supplier engaged in the collection of claims of debt to make a misstatement of fact that is designed to exaggerate the consumer's obligations to the creditor.[71] A supplier which attempts to collect or enforce an invalid debt violates R.C. § 1345.02 and R.C. § 1345.03.[72]

Consequently, while Ms. Dowling will reserve the question of compensatory damages for emotional distress, humiliation, worry, embarrassment, and inconvenience, and her attorney fee claim, for the Court's determination on the evidence produced at trial, as a matter of law plaintiff is entitled to partial summary judgment as to Litton's liability for these knowing violations of R.C. 1345.02 and R.C. 1345.03. Pursuant to R.C. 1345.09(B) and the certified PIF decisions attached, Ms. Dowling is also entitled as a matter of law to an award of three times her $17,215.29 in out-of-pocket damages, or $51,645.57.

---

[70] *Liggins v. May Co.* (Cuyahoga Co. 1977), 53 Ohio Misc. 21 (P.I.F. # 310)(certified copy attached). The "P.I.F." number is a unique designation the Ohio Attorney General's Office gives judicial decisions selected for placement in the Public Inspection File of the Ohio Attorney General's Office Consumer Protection Division. The Attorney General is required to establish and maintain that file to afford suppliers notice of acts or practices which constitute violations of the Ohio Consumer Sales Practices Act as a matter of law. *See* R.C. 1345.05. Under F.R.E. 201(B), plaintiff moves the Court to take judicial notice of the certified P.I.F. decisions attached, as proof of prior filing therein, as required by R.C. 1345.09. These decisions constitute self-authenticating documents under Federal Rule of Evidence 902 (1), (4) and (5), and their authenticity is not subject to reasonable question since defendants and this Court can verify their filing through the official state website of the Ohio Attorney General's Office.

[71] *Bennett v. Tri-State Collection Service,* No. 940002 (Cuyahoga Ct. C.P. July 23, 1976), 1976 WL 38806 (P.I.F. # 437) (certified copy attached).

[72] *Damask v. Modern Communications, LTD.* (Lucas Co. 2000), Case No. C1-99-3859 (P.I.F. #1940)(certified copy attached).

Respectfully submitted,

GRAHAM & GRAHAM CO., L.P.A.

/s/  Gary M. Smith
Gary M. Smith (0017141)
17 N. 4th St.  P.O. Box 340
Zanesville, Ohio 43702-0340
Telephone: (740) 454-8585
Fax: (740) 454-0111
gmsmith@grahamlpa.com
Trial Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies a copy of the foregoing was served through the Court's ECF/CM system on June 28, 2006:

/s/  Gary M. Smith
Gary M. Smith (0017141)

DECLARATION OF GARY M. SMITH UNDER PENALTY OF PERJURY

I, Gary M. Smith, acknowledge that I make this declaration under penalty of perjury, and state that to my personal knowledge, the exhibits attached here numbered 1 – 19 are true and accurate duplicates of authentic documents.

/s/ Gary M. Smith