**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARTHA A. DOWLING,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:05-CV-0098** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **LITTON LOAN SERVICING, LP,** | : | **Magistrate Judge King** |
| | : | |
| **Defendant.** | : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment. On June 28, 2006, Defendant Litton Loan Servicing, LP filed a motion for partial summary judgment on Plaintiff Martha Dowling's claim under the Ohio Consumer Sales Protection Act (the "OCSPA"). Two days later, on June 30, 2006, Plaintiff filed a motion for partial summary judgment on all of her legal claims against Defendant Litton Loan. For the reasons set forth herein, the Court **DENIES** Defendant's Motion, and it **GRANTS** in part and **DENIES** in part Plaintiff's Motion.

### II. BACKGROUND

#### A. Facts

The facts that form the basis for Plaintiff Martha Dowling's (hereafter, "Plaintiff") legal claims arise from a homeowner refinancing loan agreement that she and her husband, Paul Dowling,[1] entered on March 31, 1998 with lender National Consumer Services Corp. (the

---

[1]Plaintiff's husband died as the result of an automobile accident that occurred on November 4, 2001.

"Loan"). The total amount Plaintiff borrowed from National Consumer Services Corp. was $68,000.00.[2] Initially, the Loan was serviced by a company doing business under the name of Fairbanks Capital Corp. (hereafter, "Fairbanks").[3] Subsequently, effective on March 22, 2004, Fairbanks transferred the servicing on the Loan to Defendant Litton Loan Servicing, LP (hereafter, "Defendant").[4] At the time it acquired servicing responsibility, Defendant represented that Plaintiff's mortgage loan was in default in the amount of $67,750.39.

On the day it took over the servicing of the Loan, Defendant mailed Plaintiff directly a collection demand. Over the next few days, Defendant telephoned Plaintiff directly on multiple occasions regarding payment on the Loan.[5] On April 19, 2004, Litton received a letter from

_____

[2]According to the Promissory Note Plaintiff signed in connection with the Loan, Plaintiff agreed to repay the note holder on the sixth day of each month, beginning on May 6, 1998, and she agreed to pay interest on the unpaid principal of 10.65% until the full amount of the principal was paid in full. Plaintiff's monthly payment on this loan was $629.66.

[3]Fairbanks now operates its business under the name "Select Portfolio Servicing, Inc." Plaintiff has instituted a similar federal court action against Fairbanks, which is currently pending before this Court. That case is styled *Martha A. Dowling v. Select Portfolio Servicing, Inc.*, et al., Case No. C2-05-0049.

[4]On January 27, 2004, before Fairbanks transferred servicing on the Loan to Defendant, Plaintiff's counsel mailed to Fairbanks disputing any alleged delinquency or default claimed by Fairbanks concerning Plaintiff's home mortgage loan. That letter also gave notice to Fairbanks that Plaintiff was represented by counsel, and it demanded specific actions from Fairbanks concerning Plaintiff's account. In particular, Plaintiff's counsel urged Fairbanks to alter Plaintiff's account records to show that Plaintiff's mortgage was current, and to correct any reports of delinquency made to any consumer reporting agency. Fairbanks never responded to this letter.

[5]The record indicates that Defendant's employees telephoned Plaintiff directly five separate times: two of Defendant's employees, identified on Defendant's composite report for Plaintiff's account as "rwilson" and "dkennedy," telephoned Plaintiff directly on April 1, 2004; employee "mejohnso" telephoned Plaintiff directly on April 12, 2004; employee "emartine" telephoned Plaintiff directly on April 13, 2004; and employee "kljones" telephoned Plaintiff directly on April 16, 2004. During each of those telephone conversations, Plaintiff indicated to

2

Plaintiff's counsel, indicating that Plaintiff was being represented by an attorney in the matter and that Plaintiff should not be contacted directly by Defendant in the future. Nevertheless, on April 22, 2004, Defendant mailed a computer-generated collection demand to Plaintiff directly. On May 4, 2004, Defendant mailed a document titled "NOTICE OF DEFAULT AND INTENT TO ACCELERATE" to Plaintiff's home address. On May 24, 2004, Defendant mailed another "NOTICE OF DEFAULT AND INTENT TO ACCELERATE" letter directly to Plaintiff's home address. Defendant mailed another direct communication to Plaintiff on June 8, 2004. After June 8, 2004, Defendant began to direct all of its communications regarding Plaintiff's account to Plaintiff's counsel.

In addition to Defendant's direct communications with Plaintiff, there is some dispute regarding the amount of money Plaintiff owed Defendant while it serviced the Loan. When it began to service the Loan in March 2004, Defendant, using Fairbanks' payment history records from Plaintiff's account with them, found that Plaintiff was delinquent or in default on her loan payments. In a May 20, 2004 letter Plaintiff's counsel mailed to Defendant, Plaintiff's counsel indicated that there was no delinquency or default in Plaintiff's payment history with Fairbanks.[6] Responding in a letter dated June 2, 2004, Defendant acknowledged that it had viewed inaccurately Plaintiff's payment history with Fairbanks.[7] Defendant's records, however, still

---

Defendant's employees that she was represented by counsel.

[6]Along with this letter, Plaintiff's counsel sent copies of checks that Plaintiff made on the Loan from January 2003 through March 2004 to verify that Plaintiff's account was current before Defendant began to service the Loan.

[7]Specifically, the June 2, 2004 letter from Defendant to Plaintiff's counsel states, "We have reviewed the check copies you included with your letter and have accounted for all of them. We now find we viewed the payment history from Fairbanks Capital incorrectly in light of this

indicated that Plaintiff's account was delinquent by one month. Thus, Plaintiff's April 2004 loan payment, which is dated April 1, 2004, was attributed by Defendant to March 2004, and Defendant imposed a late fee upon Plaintiff.[8] According to Plaintiff, Defendant used the same method to impose additional late charges on Plaintiff for her May 2004 and June 2004 payments.

In an effort to end her relationship with Defendant, Plaintiff elected to refinance her home through another lender. Accordingly, on June 15, 2004, Plaintiff's counsel requested that Defendant generate a payoff statement for Plaintiff's account, indicating the entire amount of money Plaintiff owed to Defendant. On June 17, 2004, Defendant responded with a Payoff Statement that indicated the total amount Plaintiff owed to Defendant, including the principal, interest, and other fees and charges on the account, was $68,222.81. Defendant claimed that this total amount included principal, interest, deferred late charges, and other fees and charges owed by Plaintiff to Defendant. Plaintiff paid Defendant the entire amount of $68,222.81, using funds she received from a refinancing loan she entered through a local lender, Harvest Federal Credit Union, on June 24, 2004.[9] Even though Plaintiff paid the entire amount that Defendant alleged she owed, Plaintiff continues to dispute whether Defendant is legally entitled to collect all of it.

------------------------------------------------------

new information."

[8]Plaintiff asserts here that she had already paid her March 2004 loan payment to Fairbanks on March 6, 2004 to Fairbanks, but that Defendant did not credit her account for that payment.

[9]With respect to Plaintiff's refinancing loan agreement with Harvest Credit Union, Plaintiff borrowed a total of $70,500.00. Additionally, Plaintiff executed a Promissory Note to Harvest Federal Credit Union that she would pay interest on the unpaid principal of 5.83% until the full amount of the principal was paid in full.

### B. Procedural History

On January 28, 2005, Plaintiff filed this action in federal court. Plaintiff's complaint alleges that it is entitled to judgment from Defendant based upon its alleged violations of the following statutes: the Fair Debt Collection Practices Act (the "FDCPA"), 15 U.S.C. § 1692 *et seq.*; the Real Estate Settlement Procedures Act (the "RESPA"), 12 U.S.C. 2601 *et seq.*; the Ohio Mortgage Loan Act (the "OMLA"), Ohio Revised Code § 1321.51 *et seq.*; and the Ohio Consumer Sales Protection Act (the "OCSPA"), Ohio Revised Code § 1345.01 *et seq.* Plaintiff seeks relief in the form of compensatory and actual damages, statutory damages, treble damages, punitive damages, and an award of attorney's fees and costs.

On June 28, 2006, Defendant filed a Motion for Partial Summary Judgment on Plaintiff's claims under the OCSPA, claiming that it is exempt from such actions. Plaintiff responded to Defendant's Motion. Two days later, on June 30, 2006, Plaintiff filed a Motion for Partial Summary Judgment on all of her claims against Defendant. According to Plaintiff, the only issue remaining for the jury is a determination of the amount of non-pecuniary damages, if any, that Plaintiff should recover as the result of Defendant's FDCPA, RESPA, and OCSPA violations. Defendant responded to Plaintiff's Motion, and Plaintiff filed a reply memorandum.

Accordingly, both parties' motions for partial summary judgment are ripe for decision.

### III. STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one

side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts.  Rather, the court must evaluate each party's motion on its own merits. . . .") (citations omitted).

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©).  "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating motions for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In the case of cross-motions, the Court must "tak[e] care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388-89 (6th Cir. 1993).  Significantly, in responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine

6

issue for trial." Fed. R. Civ. P.56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38

F.3d 282, 286 (6th Cir. 1994).

## IV. ANALYSIS

As indicated, Defendant moves this Court for partial summary judgment on Plaintiff's

claims under the OCSPA only. Plaintiff, on the other hand, seeks summary judgment on its

claims under the FDCPA, the RESPA, the OMLA, and the OCSPA.

### A. Plaintiff's FDCPA Claims

Plaintiff seeks summary judgment with respect to her claims under the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692 *et seq.* Initially, the Court must determine whether

Defendant is governed by the FDCPA. Next, the Court must determine whether Plaintiff has

proved that Defendant's conduct violates the specific prohibitions set forth in the FDCPA.

#### 1. Whether the FDCPA Applies

Defendant only concedes that it is a "debt collector" under the FDCPA if Plaintiff's loan

was in default at the time the loan was service-transferred from Fairbanks to Defendant. In

support of its argument, Defendant cites the statutory definition of "debt collector," which

excludes:

> any person collecting or attempting to collect any debt owed or due
> or asserted to be owed or due another to the extent such activity (I)
> is incidental to a bona fide fiduciary obligation or a bona fide
> escrow arrangement; (ii) concerns a debt which was originated by
> such person; (iii) concerns a debt which was not in default at the
> time it was obtained by such person; or (iv) concerns a debt
> obtained by such person as a secured party in a commercial credit
> transaction involving the creditor.

15 U.S.C. § 1692a(6)(F). According to Defendant, it cannot qualify as a debt collector if, as

7

Plaintiff argues, Plaintiff's loan was not in default when Defendant took over the servicing of the Loan from Fairbanks, pursuant to 15 U.S.C. § 1692a(6)(F)(iii).

The Court understands Defendant argument on this issue to mean that Defendant cannot be held liable to Plaintiff under the FDCPA if, in fact, the evidence indicates that Defendant misrepresented to Plaintiff that her home mortgage loan was in default. Defendant's contention, however, is implausible. To the extent Plaintiff's Motion proves that the Loan was never delinquent or in default during the time Defendant began its servicing responsibilities, it simply reveals a measure to which Defendant misrepresented Plaintiff's debt. One of the express purposes of the FDCPA is to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). If this Court were to immunize Defendant from liability under the FDCPA once Plaintiff proves that her loan was never delinquent or in default, which Defendant continues to dispute, the primary purpose of the FDCPA would not be served. Mislabeling a loan as being in default, when the evidence indicates that it is not, is the type of misrepresentation which the FDCPA is intended to address. For that reason, the correct inquiry is whether the debt collector considers the consumer to owe a debt in default based upon the manner in which the debt collector acquired the debt and the manner in which the debt collector engages in debt collection activities. *See Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 539 (7th Cir. 2003) (holding that the exemption in § 1692a(6)(F)(iii) for assignees of debts not in default at the time of assignment does not apply to an assignee of a mortgagee which allegedly sent mortgagors notice that incorrectly asserted that they were in default on their mortgage loan); *see also Belin v. Litton Loan Servicing, LP*, 2006 WL 1992410, at *3 (M.D. Fla. July 14, 2006) (finding that "the determination as to whether Litton is a debt collector turns on whether Litton acquired the loan as

a debt in default and whether its collection activities were based on that understanding") (citing *Schlosser*).

In this case, the evidence shows that Defendant considered Plaintiff's debt delinquent or in default, regardless of the debt's actual status. In Defendant's first correspondence to Plaintiff, dated March 31, 2004, Defendant notes that "[b]ecause this Debt was delinquent when the servicing of the loan was acquired by Litton, Litton is a 'debt collector' for the purposes of the Federal Fair Debt Collection Practices Act and is required to inform you that this letter is from a debt collector." Subsequent correspondence sent from Defendant to Plaintiff indicate that Defendant engaged in debt collection activities to seek payment on a debt that was in default. Even today, Defendant maintains that its recorded payment history for Plaintiff's account was delinquent by one month at all relevant times. Because Defendant appears to have acquired Plaintiff's home mortgage loan as a debt in default, and because Defendant engaged in debt collection activities based on its understanding that Plaintiff's debt was delinquent or in default, Defendant is considered a "debt collector" under the FDCPA, regardless of whether Plaintiff's home mortgage loan actually was in default.

### 2. Specific Violations of the FDCPA

Having found that Defendant qualifies as a "debt collector" under the FDCPA, the Court next addresses Plaintiff's claims that Defendant violated specific violations in that Act. Plaintiff alleges that Defendant violated the FDCPA when it contacted Plaintiff directly even though Plaintiff was represented by counsel and when Defendant collected amounts from Plaintiff to which it was not legally entitled.

### a. 1692c

9

Plaintiff alleges that Defendant's conduct toward Plaintiff constitutes a violation of 15

U.S.C. § 1692c(a)(2).  That section provides that "a debt collector may not communicate with a

consumer in connection with the collection of any debt if the debt collector knows the consumer

is represented by an attorney with respect to such debt and has knowledge of, or can readily

ascertain, such attorney's name and address[.]"  15 U.S.C. § 1692c(a)(2).  It is undisputed that

when Defendant acquired Plaintiff's home mortgage loan from Fairbanks on March 22, 2004,

Defendant also received letters from Plaintiff's counsel to Fairbanks, which expressly warned

that Plaintiff was represented by an attorney and which denied permission for any direct

communications to Plaintiff.  Despite this knowledge, Defendant's records indicate that its

employees telephoned Plaintiff directly on five separate occasions[10] and that Defendant mailed to

Plaintiff's home address computer-generated written correspondences on at least four other

occasions.[11]  Because Defendant had knowledge that Plaintiff was represented by an attorney

with respect to the debt she allegedly owed in connect with her home mortgage loan, each of

Defendant's telephonic and written communications constitute a violation of 15 U.S.C. §

1692c(a)(2).

_____

[10]Defendant's own record indicates that Defendant's employees telephoned Plaintiff directly regarding her home mortgage loan debt on five separate instances:  two of Defendant's employees, identified on Defendant's composite report for Plaintiff's account as "rwilson" and "dkennedy," telephoned Plaintiff directly on April 1, 2004; employee "mejohnso" telephoned Plaintiff directly on April 12, 2004; employee "emartine" telephoned Plaintiff directly on April 13, 2004; and employee "kljones" telephoned Plaintiff directly on April 16, 2004.  During each of those telephone conversations, Plaintiff indicated to Defendant's employees that she was represented by counsel with respect to the disputed amount of debt she owed on her home mortgage loan.

[11]Defendant's record indicated that Defendant mailed correspondences to Plaintiff directly regarding her home mortgage loan debt on the following dates: March 31, 2004; April 22, 2004; May 4, 2004; and May 24, 2004.

10

b.  1692e

Plaintiff also claims that Defendant violated § 1692e FDCPA.  That section of the Act, in

relevant part, provides:

> A debt collector may not use any false, deceptive, or misleading
> representation or means in connection with the collection of any
> debt.  Without limiting the general application of the foregoing, the
> following conduct is a violation of this section:
>
> (2)   The false representation of–(A) the character, amount, or
>        legal status of any debt. (B) any services rendered or
>        compensation which may be lawfully received by any debt
>        collector for the collection of a debt;
>
> (5)   The threat to take any action that cannot legally be taken . . . .

15 U.S.C. § 1692e.

According to Plaintiff, Defendant violated § 1692e(2) on April 22, 2004, when it mailed

to Plaintiff directly a computer-generated collection letter that falsely represented that her loan

was "seriously past due for the 3/6/2004 and 4/6/2004 mortgage payments totaling $1,659.34."

Plaintiff insists that she made the March 2004 payment to Fairbanks, Plaintiff's loan servicer

immediately prior to Defendant, before Defendant had assumed loan servicing responsibility on

her account.[12]  Additionally, Plaintiff maintains that she mailed her April 2004 payment to

Defendant on April 1, 2004.[13]  Consequently, Plaintiff argues that Defendant's April 22, 2004

---

[12]Exhibit 9 to Plaintiff's Motion for Partial Summary Judgment is a copy of a check #
7384, dated March 1, 2004 and written to Fairbanks Capital Corp., which evidences Plaintiff's
March 2004 mortgage payment.  Defendant contends, however, that the payment history it
received from Fairbanks shows that check # 7384 was applied to Plaintiff's payment due in
February 2004.  Consequently, Defendant asserts that it relied upon Fairbank's payment history
records.

[13]On page 4 of Defendant's response to Plaintiff's Motion, Defendant concedes that it
received Plaintiff's April 2004 payment on April 6, 2004.  Defendant states that, in accordance

11

letter falsely represented the amount of debt she owed to Defendant, in violation of 15 U.S.C. § 1692e(2)(A).

Even if this Court accepts Defendant's version of the facts regarding Plaintiff's loan payment history as of April 22, 2004, Defendant's written correspondence to Plaintiff still constitutes a violation of 15 U.S.C. § 1692e(2)(A). Defendant argues that it applied Plaintiff's March 2004 payment to February 2004, and that it applied Plaintiff's April 2004 payment to March 2004 because Defendant had been delinquent in her mortgage loan payments by one month. Yet, Defendant's April 22, 2004 letter to Plaintiff stated that Plaintiff was "seriously past due for the 3/6/2004 and 4/6/2004 mortgage payments totaling $1,659.34." By Defendant's own admission, it had received a loan payment from Plaintiff on April 6, 2004, which it applied to the March 2004 payment period. Accordingly, under Defendant's version of the facts, Plaintiff would have only been delinquent with respect to her April 2004 payment on April 22, 2004, the date Defendant mailed the letter to Plaintiff. Instead of Plaintiff's loan being past due for two months, Defendant's notice should have indicated that her account was one month past due. Correspondingly, the amount of money Plaintiff allegedly owed Defendant should have been half of the amount provided in the April 22, 2004 letter. When Defendant mischaracterized the amount Plaintiff owed it in its April 22, 2004 letter, Defendant violated 15 U.S.C. § 1692e(2)(A).

Similarly, Defendant violated 15 U.S.C. § 1692e(5) when it served Plaintiff directly with two formal notices, dated May 4, 2004 and May 24, 2004, titled "NOTICE OF DEFAULT AND INTENT TO ACCELERATE." Those notices represented that Plaintiff's loan was in default,

---

with its debt collection procedures, it applied the April 6, 2004 payment to the March 2004 payment due to Plaintiff's one-month delinquency, again in reliance upon Fairbanks' payment history records.

and they threatened to accelerate her loan and commence foreclosure if Plaintiff did not pay

Defendant immediately the $1,659.34 it claimed it was entitled to in the April 22, 2004 letter.

Because the Court finds that the amount Defendant claimed Plaintiff owed is inaccurate, even

under Defendant's own version of the facts, Defendant's formal notices, dated May 4, 2004 and

May 24, 2004, constitute violations of 15 U.S.C. § 1692e(5).

c. 1692f[14]

Plaintiff's allegations against Defendant pursuant to 15 U.S.C. § 1692f all relate to

unauthorized charges that Defendant assessed on Plaintiff when she refinanced her home

mortgage loan through Harvest Federal Credit Union and paid off Defendant's entire payoff

quote for $68,222.81. Section 1692f provides, *inter alia*, that a debt collector may not use any

unfair or unconscionable means to collect any debt, including "[t]he collection of any amount

(including any interest, fee, charge, or expense incidental to the principal obligation) unless such

amount is expressly authorized by the agreement creating the debt or permitted by law." 15

U.S.C. § 1692f(1). Plaintiff's claims that Defendant violated § 1692f(1) of the FDCPA arise

from disputed amounts Defendant charged Plaintiff in its payoff statement, including the

following: (1) attorney fees and costs for Plaintiff's Chapter 13 bankruptcy proceeding; (2)

"Prior Servicer Fees"; (3) interest due from March 14, 2004; (4) and late charges and deferred

late charges.

<u>1. Attorney fees and costs for Plaintiff's Chapter 13 bankruptcy proceeding</u>

---

[14]Both Plaintiff and Defendant appear to have cited the incorrect provision of the FDCPA
for this argument. They both analyze this issue under § 1692g. Both arguments, however,
address statutory language provided in § 1692f, which prohibits a debt collector's unfair practices
in collecting on a debt. For that reason, the Court will analyze this issue using the proper statute,
§ 1692f.

First, Plaintiff claims that Defendant illegally collected, as part of the $68,222.81 paid from Plaintiff to Defendant to refinance her home mortgage loan, $1,050.00 in attorney's fees and costs associated with Plaintiff's Chapter 13 bankruptcy proceeding, which concluded in August 2002. To show that Defendant charged Plaintiff these fees, Plaintiff relies exclusively upon Defendant's Composite Report for Plaintiff's account, which includes two debits on May 10, 2004 that read: "BK Atty Fees 900.00"and "BK Atty Costs 150.00," respectively. Plaintiff asserts that this document alone proves that Defendant charged her $1050.00 for fees associated with her bankruptcy proceeding. Plaintiff then argues that basic bankruptcy law prohibits Defendant from collecting or attempting to collect those fees from her unless they were an approved claim included in her Chapter 13 plan. According to Plaintiff, Defendant's attorney's fees and court costs were not included in her Chapter 13 plan. Moreover, Plaintiff notes that such fees were not authorized by the Promissory Note that Defendant was servicing; the Note did not provide any responsibility for attorney's fees except for "reasonable attorney's fees, awarded by a court judgment," but Plaintiff contends that there was no award of fees during her bankruptcy proceeding to justify the charges. Therefore, Plaintiff concludes that Defendant violated U.S.C. § 1692f(1) when it charges Plaintiff for attorney fees and court costs associated with Plaintiff's bankruptcy proceeding because such fees were not permitted by law or authorized by the Promissory Note.

Defendant responds that the payoff quote of $68,222.81 does not include bankruptcy fees of $1,050.00, and it further states that has not proved that Defendant ever collected bankruptcy attorney fees or that any interest was assessed on bankruptcy attorney fees.

After reviewing Defendant's Composite Report for Plaintiff's account and Defendant's

14

Payoff Statement for Plaintiff's account, the Court finds that Plaintiff has not proved sufficiently that Defendant charged her for bankruptcy-related attorney fees and costs. Defendant's Composite Report for Plaintiff's account does include what appears to be two debits to Plaintiff's account on May 10, 2004, described merely as "BK Atty Fees 900.00" and "BK Atty Costs 150.00," respectively. On that same day, however, Defendant's Composite Report indicates what appears to be two corresponding credits to Plaintiff's account, listed as "BK Atty Fees - 982.86" and "BK Atty Costs -228.00." When taken together, these debits and credits seemingly cancel each other out, resulting in no charge to Plaintiff's account. Additionally, Defendant's Payoff Statement, generated on June 17, 2004, does not designate specifically that Defendant charged Plaintiff for any bankruptcy-related fees or costs. Because there appears to be a genuine issue of material fact regarding whether Plaintiff actually paid Defendant for attorney fees and costs related to Plaintiff's Chapter 13 bankruptcy proceedings, Plaintiff is not entitled to summary judgment on its claim that Defendant violated § 1692f(1).

ii. "Prior Servicer Fees"

Second, Plaintiff claims that Defendant illegally collected, as part of the $68,222.81 paid from Plaintiff to Defendant to refinance her home mortgage loan, $5,290.31 in "Prior Servicer Fees." To show that Defendant charged Plaintiff these fees, Plaintiff again relies exclusively upon Defendant's Composite Report for Plaintiff's account, which includes four debits on May 10, 2004 that read: "MISC 3,076.34," "Prop Insp 34.05," "FC BPO 415.00," and "Misc Corp Adv Disb 1,106.00," respectively. Plaintiff asserts that this document alone proves that Defendant charged her a combined total of $5,290.31 in "Prior Servicer Fees." Plaintiff argues that these "Prior Servicer Fees" were not permitted by law or authorized by her Promissory Note,

15

and when Defendant assessed those fees on her account, it violated § 1692f(1).

Defendant claims that it never charged Plaintiff $5,290.31 for "Prior Sevicer Fees" as part of its Payoff Statement for Plaintiff's account. According to Defendant, its Payoff Statement only charged Plaintiff $536.36 for "Prev Servicer Exp," which Defendant contends it was authorized to do under the Promissory Note.

After reviewing Defendant's Composite Report for Plaintiff's account and Defendant's Payoff Statement for Plaintiff's account, the Court finds that Plaintiff has not proved sufficiently that Defendant in fact charged her $5,290.31 in "Prior Servicer Fees." Defendant's Payoff Statement, which lists each of the charges Defendant assessed upon Defendant, does not include any "Prior Servicer Fee" for $5,290.31. Defendant's Payoff Statement does, however, list a "Prev Servicer Exp" for $536.36, but Plaintiff does not appear to dispute that charge in her motion for partial summary judgment. Plaintiff calculated the $5,290.31 figure by adding up various charges from May 10, 2004 that it located on Defendant's Composite Report for Plaintiff's account. While Defendant's Composite Report does indicate a total debited amount of $5,290.31 from Plaintiff's account on May 10, 2004, it also indicates a corresponding credit to Plaintiff's account on the same date for $6,362.66. These debits from and corresponding credits to Plaintiff's appear to cancel each other out. At any rate, Plaintiff has not proved that she ever actually paid $5,290.31 in "Prior Service Fees" to Defendant. Because there appears to be a genuine issue of material fact regarding whether Plaintiff actually paid Defendant for any "Prior Service Fees," Plaintiff is not entitled to summary judgment on its claim that Defendant violated § 1692f(1).

iii. Interest due from March 14, 2004

Third, Plaintiff claims that Defendant illegally collected, as part of the $68,222.81 paid from Plaintiff to Defendant to refinance her home mortgage loan, double-charged interest on her account in the amount of $1,614.06. Defendant's Payoff Statement for Plaintiff's account indicates that Defendant charged Plaintiff $2,075.81 from March 14, 2004 through July 1, 2004. Plaintiff claims that Defendant demanded payment of interest charges for this period, despite the fact that Plaintiff had already paid the interest on her account as part of her monthly payments, which she insists were never delinquent.

Defendant counters that its payment history for Plaintiff's account shows that Plaintiff was delinquent in her mortgage payments by one month. Accordingly, Defendant applied the payment it received from Plaintiff on May 6, 2004 to the payment that was due on April 6, 2004. Furthermore, Defendant insists that because "mortgage loan interest is paid an average of 30 days in arrears the interest [on its Payoff Statement] was listed as owed from [March 14, 2004].

The issue of whether Defendant overcharged Plaintiff for interest on her mortgage loan in the Payoff Statement turns on whether Plaintiff's monthly mortgage payments were in fact delinquent by one month during the time Defendant serviced her mortgage loan. If Plaintiff's account was delinquent, as Defendant maintains, then Defendant was authorized to charge her interest in the amount of $2,075.81 in its Payoff Statement. If, on the other hand, Plaintiff's account was current, as Plaintiff suggests, then Defendant was not authorized to charge her interest in the amount of $2,075.81, and any such charge violated § 1692f(1) of the FDCPA. The fact that the parties disagree on whether Plaintiff's account was delinquent or current indicates that there is a genuine issue of material fact with respect to Plaintiff's claim, precluding summary judgment.

17

iv. Late charges and deferred late charges

Fourth, Plaintiff claims that Defendant illegally collected, as part of the $68,222.81 paid

from Plaintiff to Defendant to refinance her home mortgage loan, "Late Charges" in the amount

of $31.48 and "Defer Late Charges" in the amount of $346.28. Both of these charges are

reflected on Defendant's Payoff Statement for Plaintiff's account. Plaintiff claims that

Defendant demanded payment of the late charges and the deferred late charges, despite the fact

that Plaintiff had paid timely all of her monthly loan payments.

Defendant counters that it was entitled to charge Plaintiff's account for late fees.

Defendant asserts that it charged Plaintiff a late fee of $31.48 because payment history indicated

that Plaintiff's loan repayment was one month delinquent. Defendant further asserts that the

deferred late fee charge of $346.28 was authorized by the Promissory Note on the loan.

The issue of whether Defendant illegally charged Plaintiff for late fees and deferred late

fees in the Payoff Statement also turns on whether Plaintiff's monthly mortgage payments were

in fact delinquent during the time Defendant serviced her mortgage loan. If Plaintiff's account

was delinquent, as Defendant maintains, then Defendant was authorized to collect the late fees

and deferred late fees included on its Payoff Statement.[15] If, on the other hand, Plaintiff's

---

[15]The Promissory Note entered between Plaintiff, the borrower, and National Consumer
Services Corp., the lender, dated March 31, 1998, provides:

> If a Note Holder has not received the full amount of any monthly
> payment by the end of fifteen calendar days after the date it is due,
> I will pay a late charge to the Note Holder in addition to interest
> accrued on the unpaid principal. The amount of the charge will be
> 5% of my overdue payment of principal and interest[.]

This provision in the Promissory Note authorize Defendant to charge Plaintiff for late fees if she
did not make timely her payments on her home mortgage loan.

18

account was current, as Plaintiff suggests, then Defendant was not authorized to collect the late

fees and deferred late fees, and any such charge violated § 1692f(1) of the FDCPA. The fact

dispute regarding whether Plaintiff's account was delinquent or current indicates that there is a

genuine issue of material fact with respect to Plaintiff's claim, precluding summary judgment.

### d. 1692h

Plaintiff argues that Defendant's conduct also violated 15 U.S.C. § 1692h. That section

of the FDCPA provides: "If any consumer owes multiple debts and makes any single payment to

any debt collector with respect to such debts, such debt collector may not apply such payment to

any debt which is disputed by the consumer and, where applicable, shall apply such payment in

accordance with the consumer's directions." 15 U.S.C. § 1692h.

According to Plaintiff, Defendant's discovery responses prove that it knew Plaintiff

disputed some of the debt she owed.[16] Nevertheless, Plaintiff asserts that when she delivered her

June 2004 mortgage payment to Defendant, along with written instructions from her that the

payment be applied to the principal and interest due on her loan for the month of June 2004,

Defendant disregarded her written instructions and applied her payment instead to a monthly

payment that Defendant maintained was past due. Plaintiff contends that when Defendant

ignored her directions by applying her June 2004 payment to an earlier month's payment,

Defendant did so pursuant to its disputed contention that Plaintiff's account was delinquent

because of unpaid charges and installments.

---

[16]At any rate, this Court finds that Defendant knew or should have known that Plaintiff
disputed the amount she owed Defendant when Defendant assumed debt collection services on
Plaintiff's account from Fairbanks and when Defendant received correspondence directly from
Plaintiff's counsel disputing the amount of Plaintiff's debt.

19

With respect to Plaintiff's allegation under § 1692h, Defendant counters that Plaintiff "tendered the June 2004 check as a payment on the loan" and that Plaintiff "did not dispute the mortgage debt as a whole." Pursuant to its interpretation of § 1692h, Defendant was not required to provide Plaintiff with credit for a monthly payment that the servicing records indicate has not yet been made.

The Court concludes that § 1692h contemplates a circumstance under which a debt collector manages multiple debts for a debtor. *See Camacho v. Bridgeport Fin., Inc.*, 430 F.3d 1078, 1082 (9th Cir. 2005). The evidence before this Court indicates that Defendant only serviced one of Plaintiff's debts, her homeowner refinancing loan. As such, § 1692h is not applicable to the facts of this case, and Plaintiff is not entitled to summary judgment on that claim.

### 3.  Permitted Recovery Under FDCPA

The type and amount of damages a Plaintiff may recover for a violation of the FDCPA is provided in 15 U.S.C. § 1692k. That section, in relevant part, provides:

> Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of any actual damage sustained by such person as a result of such failure[,] . . . such additional damages as the court may allow, but not exceeding $1,000[, and] . . . the costs of the action, together with a reasonable attorney's fee as determined by the court[.]

15 U.S.C. § 1692k(a). The "actual damages" recoverable under § 1692k(a) may include compensatory damages for emotional distress, humiliation, and embarrassment. *See Boyce v. Attorney's Dispatch Service*, 1999 WL 33495605, at *1 (S.D. Ohio April 27, 1999). Any out-of-

pocket or other consequential losses are also compensable under § 1692k(a) as "actual damages."

In her motion for partial summary judgment, Plaintiff reserves the question of compensatory damages for emotional distress, humiliation, and embarrassment for the Court's determination on the evidence produced at trial. As noted above, the Court finds that Plaintiff has not proved sufficiently at this stage of the litigation that she has suffered any out-of-pocket or other consequential losses as a result of Defendant's FDCPA violations. Because Plaintiff is entitled to summary judgment on its claims that Defendant violated sections 1692c and 1692e, however, this Court awards Plaintiff statutory damages in the amount of $1,000.00. *See Wright v. Fin. Serv. of Norwalk*, 22 F.3d 647, 651 (6th Cir. 1994) (holding that "15 U.S.C. § 1692k(a)(2)(A) limits a plaintiff's additional damages to $1,000 'per proceeding' rather than 'per violation.'"); *see also Woolfork v. Van Ru Credit Corp*, 783 F.Supp. 724, 727 n.3 (D. Conn. 1990) (finding that an award of statutory damages in an FDCPA action does not require the proof of actual damages).

### B. Plaintiff's RESPA Claims

Plaintiff also alleges that Defendant violated the Real Estate Settlement Procedures Act when it failed to correct disputed amounts Plaintiff owed Defendant on her home mortgage loan. The relevant provision of the RESPA Plaintiff cites, states:

> Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request[17] . . . and, if applicable, before taking any action with

---

[17]The term "qualified written request" is defined in the statute as:

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that –

respect to the inquiry of the borrower, the servicer shall –

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower); [or]

> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes –

>> (I) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

>> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower[.]

12 U.S.C. § 2605(e)(2).

Plaintiff claims that Defendant violated § 2605(e)(2)(A) when it received her qualified written request, which was sent by her attorney on April 15, 2004, but failed to correct errors on her account.[18] Defendant responds that it complied with its obligation to respond to Plaintiff's

---

>> (I) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

>> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

[18]According to Plaintiff, her qualified written request to Defendant sought to correct the errors described in Section IV.A.2.c. of this Bench Memorandum, namely for charges related to all attorney fees, prior servicer fees, late payment charges, and any interest charges attributable to those fees that were improperly debited to Plaintiff's account.

April 15, 2004 qualified written request when it responded to Plaintiff's counsel by letter on April 26, 2004.  Moreover, Defendant notes that it sent Plaintiff's counsel a second letter, dated June 2, 2004, which explained its record of Plaintiff's payment history and which verified her debt.

The Court has reviewed the correspondences referenced by the parties with regard to Plaintiff's claim against Defendant under the RESPA.  The letter mailed from Plaintiff's counsel to Defendant on April 15, 2004 constitutes a "qualified written request" because it: (1) identifies Plaintiff's name and account number; and (2) requested "an accounting of the various charges and payments applicable to the account" and further demanded validation of the debt.  *See* 12 U.S.C. § 2605(e)(1)(B).  Defendant's two responses to Plaintiff's qualified written request, dated April 26, 2004 and June 2, 2004, respectively, appear to satisfy Defendant's obligation under RESPA because they were both sent within the sixty (60) day period following Defendant's receipt of Plaintiff's qualified written request.  Furthermore, the content of Defendant's two letters appears to comport with its statutory obligation under 12 U.S.C. § 2605(e)(1)(B) because it explains specifically why Plaintiff's account was accurate and, it provided to Plaintiff's counsel Defendant's telephone number.  *See* 12 U.S.C. § 2605(e)(1)(B).  Because there is at least a genuine issue of material fact as to whether Defendant complied with its obligation to Plaintiff when it responded to her qualified written request, Plaintiff is not entitled to summary judgment on that claim.[19]

### C.  Plaintiff's OMLA Claims

--------

[19]Because the Court concluded that Plaintiff is not entitled to summary judgment as to liability on her claim that Defendant violated RESPA, it need not address the damages issue with respect to that claim.

Plaintiff argues that Defendant violated the Ohio Mortgage Loan Act when it collected, as part of the $68,222.81 paid from Plaintiff to Defendant to refinance her home mortgage loan, excessive interest and other unauthorized charges.  Defendant responds that Plaintiff has not proved that the OMLA applies or that Defendant violated the OMLA.

As a threshold matter, the Court must determine whether the Ohio Mortgage Loan Act even applies to Defendant.  The statute governs second mortgage security loans.  OHIO REV. CODE § 1321.51, *et seq.*  Under the OMLA,

> [n]o person, on that person's own behalf or on behalf of any other person, shall do either of the following without having first obtained a certificate of registration from the division of financial institutions:
>
> (a) Advertise, solicit, or hold out that the person is engaged in the business of making loans secured by a mortgage on a borrower's real estate which is other than a first lien on the real estate;
>
> (b) Engage in the business of lending or collecting the person's own or another person's money, credit, or choses in action for such loans.

OHIO REV. CODE § 1321.52(A)(1).

Defendant appears to concede that it is regularly engaged in the business of collecting or servicing home mortgage loan payments.  Moreover, public records indicate that Defendant sought and obtained a certificate of registration from the Ohio Department of Commerce to conduct its business, pursuant to Ohio Revised Code § 1321.52(A)(1), on October 25, 2000.  Because Defendant admittedly was servicing Plaintiff's home mortgage loan, which is the subject of this action, Defendant's conduct is governed by the OMLA.

The OMLA provides restrictions on the interest and other charges that a registrant may assess upon a borrower.  *See* OHIO REV. CODE § 1321.57.  In particular, subsection 1321.57©)

24

designates how a registrant should charge a borrower. *See* OHIO REV. CODE § 1321.57©).

Similarly, subsection 1321.57(H) restricts a registrant's authority to charge a borrower for

miscellaneous fees in connection with the borrower's account. *See* OHIO REV. CODE §

1321.57(H). Finally, subsection 1321.57(L) entitles a registrant to collect a default charge on any

scheduled installment not paid in full, if the loan contract so provides. *See* OHIO REV. CODE §

1321.57(L).

 As the Court has concluded earlier, there is a genuine issue of material fact as to whether

Defendant ever collected excessive interest on Plaintiff's account. There is also a genuine issue

of material fact as to whether Defendant ever collected unauthorized or illegal charges in

connection with Plaintiff's account. For that reason, Plaintiff is precluded from summary

judgment on the issue of whether Defendant is liable to her under the OMLA.[20]

### D. Plaintiff's OCSPA Claims

 The parties cross-move for summary judgment on Plaintiff's claim under the Ohio

Consumer Sales Protection Act. According to Defendant, the OCSPA does not apply to it

because it is entitled the statute's "financial institution" exemption. Plaintiff contends that the

OCSPA applies to Defendant because it is not a "financial institution," and she further argues

that Defendant is liable to her because it violated the statute.

 The OCSPA provides that "[n]o supplier shall commit an unfair or deceptive act or

practice in connection with a consumer transaction. Such an unfair or deceptive act or practice

by a supplier violates [the OCSPA] whether it occurs before, during, or after the transaction."

---

[20]Because the Court concluded that Plaintiff is not entitled to summary judgment as to
liability on her claim that Defendant violated OMLA, it need not address the damages issue with
respect to that claim.

OHIO REV. CODE § 1345.02(A). The OCSPA defines the term "consumer transaction" as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." OHIO REV. CODE § 1345.01(A). The definition of "consumer transaction," however, specifically excludes transactions between "financial institutions"[21] and their customers. *Id.* Among the list of exempted "financial institutions" is "a bank, banking association, trust company, savings and loan association, savings bank or other banking institution that is incorporated or organized under the laws of any state." OHIO REV. CODE § 5725.01(A)(3).

In order for the Court to determine whether the OCSPA applies to Defendant in this case, it must first decide whether the business between Plaintiff and Defendant is a qualifying "consumer transaction." While Defendant concedes that it does not meet the definition of a "financial institution" under the OCSPA, it argues, without citing any legal authority, that the exclusion of financial institutions should also cover their loan servicing agents. The Court is not compelled by this argument. Under Ohio law, a court must strictly construe exceptions or exemptions to a general law such that what is not clearly excluded from operation of the law is clearly included therein. *Pioneer Linen Supply Co. v. Evatt*, 65 N.E.2d 711, 712 (Ohio 1946). If the legislature intended to exempt all loan servicing agents from coverage under the OCSPA, it

_____

[21]The direct quote from the statute, in relevant part, is that "'[c]onsumer transaction does not include transactions between persons, defined in sections 4905.03 and 5725.01 of the Revised Code, and their customers." OHIO REV. CODE § 1345.01(A). Section 5725.01 then provides a list of entities that qualify as "financial institutions." See OHIO REV. CODE § 5725.01(A).

would have done so.[22] This Court will not extend the OCSPA's exemption beyond its clear and unambiguous meaning. For that reason, the Court finds that the OCSPA applies to Defendant in this case. Therefore, Defendant's Motion for Partial Summary Judgment is **DENIED**.

Having found that the OCSPA applies to the consumer transaction at issue, the Court must decide whether Plaintiff has proved that Defendant violated the OCSPA. According to Plaintiff, Defendant violated the OCSPA when it collected, as part of the $68,222.81 paid from Plaintiff to Defendant to refinance her home mortgage loan, excessive interest and other unauthorized charges. Once more, there are genuine issues of material fact as to whether Defendant ever collected excessive interest or impermissible fees and charges on Plaintiff's account. Thus, Plaintiff is precluded from summary judgment on the issue of whether Defendant is liable to her under the OCSPA.[23]

### E. Duplicative Damages

While the Court has not awarded Plaintiff any actual damages at this stage of the litigation because Plaintiff has not yet proved such damages sufficiently, it understands that Plaintiff seeks to recover its alleged actual damages under each of the four statutes for which she brings suit against Defendant. Such a recovery of duplicative actual damages is impermissible.

---

[22]Interestingly, if Defendant maintained an office within the state, it may have qualified as a "financial institution" under the OCSPA as a "dealer in intangibles." A "dealer in intangibles" is defined as "every person who keeps an office or other place of business in this state and engages at such office or other place in the business of lending money, . . . whether on the person's own account with a view to profit, or as an agent or broker for others, with a view to profit or personal earnings." OHIO REV. CODE § 5725.01(B). Because Defendant does not maintain an office in Ohio, however, it does not qualify as an exempted "dealer in intangibles."

[23]Because the Court concluded that Plaintiff is not entitled to summary judgment as to liability on her claim that Defendant violated OCSPA, it need not address the damages issue with respect to that claim.

*See Wright v. Litton Loan Servicing LP*, 2006 WL 891030, at *4 (E.D. Pa. April 4, 2006)

(precluding a plaintiff from recovering actual damages multiple times under the RESPA, the

FDCPA, and two other state statutes because it "would represent a duplication of recoveries");

*see generally Kramer v. McCarthy*, 2006 WL 581244, at *5 (S.D. Ohio March 8, 2006). In

*Kramer*, this Court found:

> The law abhors duplicative recoveries, and a plaintiff who is
> injured by a defendant's misconduct is, for the most part, entitled to
> be made whole, not enriched. *See Bender v. City of New York*, 78
> F.3d 787 (2d Cir. 1996); *Mason v. Oklahoma Turnpike Authority*,
> 115 F.3d 1332 (10th Cir 1997) (double recovery is precluded when
> alternative theories seeking the same relief are pled and tried
> together). Accordingly, a plaintiff who alleges separate causes of
> action is not permitted to recover more than the amount of damage
> actually suffered; there cannot be double recovery for the same loss,
> even though different theories of liability are alleged in the
> complaint. *See Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490
> (2d Cir. 1995) (a plaintiff is not entitled to a separate compensatory
> damage award under each legal theory when he relies on alternate
> theories of liability; instead, he is entitled to one compensatory
> damage award if liability is found on any or all of the theories).

*Id.* While *Kramer* arose in the context of an alleged breach of fiduciary duty, as opposed to

allegedly unlawful debt collection practices, this Court's analysis on the damages issue in

*Kramer* applies directly to the appropriate measure of actual damages recoverable in this case.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Partial Summary

Judgment, and it **GRANTS** in part and **DENIES** in part Plaintiff's Motion for Partial Summary

Judgment.

Plaintiff has proved that Defendant is liable to her under the Fair Debt Collection

Practices Act for violating sections 1692c and 1692e of that statute. Therefore, Plaintiff is

entitled to recover statutory damages from Defendant in the amount of $1,000.00.  Plaintiff, however, has not proved she is entitled to summary judgment on her claim that Defendant violated sections 1692f and 1692h of the FDCPA, and Plaintiff has not proved that she is entitled to any actual damages from Defendant for its multiple FDCPA violations at this stage of the litigation.

Regarding Plaintiff's other claims against Defendant under the Real Estate Settlement Procedures Act, the Ohio Mortgage Loan Act, and the Ohio Consumer Sales Protection Act, Plaintiff is not entitled to summary judgment on liability or damages.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATED: December _1_, 2006**